Filed 5/14/15 In re Y.S. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re Y.S. et al., Persons Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>G.S.,<br><br>    Defendant and Appellant. | A142541<br><br>(Contra Costa County<br>Super. Ct. Nos. J14-00094<br>& J14-00095) |

In this dependency proceeding, G.S. (Father) appeals dispositional orders under Welfare and Institutions Code[1] section 300 with respect to his daughter (Y.S.) and son (I.S.). He claims there was insufficient evidence to support both the jurisdictional findings and the findings at disposition that the children would be at risk of "substantial danger to the[ir] physical health, safety, protection, or physical or emotional well-being" if returned to their father's custody due to his reported abuse of an older half-sibling. (§§ 300, subd. (j), 361, subd. (c)(1).) He further contends the court erred by failing to ensure that notice was sent to the Apache tribes under the Indian Child Welfare Act of

---

[1] Statutory references, unless otherwise indicated, are to the Welfare and Institutions Code.

1

1978, 25 U.S.C. § 1901 et seq. (ICWA) based on a claim of Indian ancestry by the children's mother. Finding no merit to his arguments, we affirm the orders.

## I. BACKGROUND

This family's dependency proceedings involve the removal of four young siblings from Father's custody. The ages of the children at disposition were ten, for J.M., a boy; five, for Y.S., a girl; nineteen months, for I.S., a boy; and two months, for D.S., an infant girl. C.Q. (Mother) is the biological parent of all four. Father is the biological parent of the youngest three, and the stepfather of J.M. When the case arose, Father and Mother (then pregnant with D.S.) were unwed but living together and raising J.M., Y.S. and I.S. in one household as a family unit. Normally, Father stayed home and took care of the children, while Mother worked full-time.

### A. The report from J.M.'s school

The Contra Costa County Children and Family Services Bureau (Bureau) opened an investigation after receiving a report that J.M. arrived at his elementary school one day in January 2014 with his left index finger and hand extremely swollen and bruised. Two days earlier, J.M.'s teacher had written his name on the blackboard at school for throwing raisins at another student. When J.M.'s teacher reported the raisin-throwing incident to Father at the end of the school day, she tried to emphasize its minimal nature and suggested it warranted only mild discipline, such as requiring J.M. to give up television for one night.

J.M. missed school the next day. When J.M. returned to school on January 23, 2014 with an injured hand, he explained to his teacher that his stepfather had disciplined him for the raisin-throwing incident by bending back his left index finger. J.M. was reluctant to talk about his injury because Father had told him not to tell anyone how it happened. J.M. also reported to his teacher that Father told him if he told anyone what happened, the police would come and take J.M. and his younger siblings away from the family. Father gave J.M. a cover story—if Mother or anyone else asks about the injury, he said, J.M. was to say he injured his hand by falling off a chair.

2

In the course of the Bureau's investigation, both J.M.'s teacher and principal said it was unusual for him to be in trouble at school. He was a well-behaved and gifted child who presented few if any problems for his teachers.[2] Father, on the other hand, had been a problematic figure at J.M.'s school. A school attendance secretary said Father had a "bit of a temper" and an "intense personality." Others at the school reported Father had interacted inappropriately with school personnel in the past. According to school officials, Father insisted on being informed of everything that happened with J.M. at school, so they were always on "hyper alert" in responding to him. In fact, J.M.'s teacher was reluctant to tell Father of any misbehavior by J.M. because she feared there would be retaliation at home. J.M.'s teacher thought Father was much harder on J.M. than was necessary for such a compliant child.

In accordance with their mandatory reporting obligations, school officials reported the finger-bending incident involving J.M. to the Bureau the same day it occurred. J.M. told the Bureau's emergency response social worker he had been disciplined for failing to complete a chore at home. His stepfather had taken him into a different room, away from his half-siblings, when the discipline was imposed, he told the emergency response social worker. As he had told his teacher, J.M. again reported Father's instruction that he lie to Mother or anyone else who asked about his injured finger in order to cover up how it really happened. J.M.'s interview at school with the social worker also revealed other evidence of physical abuse. J.M. reported that Father had spanked him in the past with a belt, a shoe, and a clothes hanger. The week before the finger-bending incident, J.M. reported, Father had slapped him across the face, which briefly left a red mark. One time, Father got mad at J.M. while he was eating a slice of pizza. Father took the pizza and rubbed it in J.M.'s face. J.M. also reported that Father occasionally spanked Y.S., but I.S. was not spanked because he was too young.

---

[2] J.M. did have some attendance problems, however, and ended up missing 20 days between the beginning of the school year and April 25, 2014.

After being interviewed by an emergency response social worker at his school, J.M. was taken to the hospital, where a doctor confirmed his finger was badly sprained. When confronted with J.M.'s accusation against Father, Mother was at first incredulous and said she had no knowledge any abuse was occurring, but she agreed to take the children to the home of their paternal grandmother so as to separate them from Father. Mother was cooperative with the Bureau and agreed to do anything necessary to keep the children safe. When the social worker and a police officer went to the family home to investigate further, both Y.S. and I.S. appeared to be healthy. The home was clean and adequately furnished. No health or safety hazards were noted. Still, the children were taken into protective custody, and Father was arrested for a violation of Penal Code section 273, subdivision (a) (willful harm or injury to a child).[3]

The Bureau's interviews of school personnel revealed another troubling incident at J.M.'s school a few months earlier, in the fall of 2013. J.M. and another child "bonked" heads together when they were walking in line. It appeared to school authorities to be a minor incident, which left only a small bump above J.M.'s eyebrow. Ice was applied and J.M.'s parents were contacted. The next day J.M. appeared at school with a black-and-blue eye that seemed out of proportion to the incident the day before. Mother took J.M. to the doctor the following week to have the head injury checked, as he was vomiting and had "almost passed out." X-rays were taken at that time and showed a "probable old nose fracture." J.M. missed a week of school, and when he returned he had two black eyes. Mother told the school the injuries were the result of the "bonking" incident, but the school authorities doubted that explanation.

**B. The juvenile court proceedings**

*1.    Detention and jurisdiction*

On January 27, 2014, the Bureau filed section 300 petitions on behalf J.M., Y.S. and I.S. The petition filed on behalf of J.M. alleged he had "suffered, or that there was

---

[3] Upon Father's release from jail, he agreed to move in with his brother in San Leandro, thus acquiescing in a temporary living arrangement separate from his children, pending whatever orders the court made in these proceedings.

substantial risk...[he] will suffer, serious physical harm inflicted nonaccidentally upon [him] by [his] parent or guardian." (§ 300, subd. (a).) For Y.S. and I.S., the Bureau alleged their "sibling has been abused...as defined in subdivision (a)...and there is a substantial risk that [they] will be abused...as defined in [that] subdivision[]." (§ 300, subd. (j).)

The case came on for a detention hearing on January 28, 2014, the same day the Bureau filed its Detention/Jurisdiction Report. The focus of the hearing was solely on keeping the children safe from Father. The Bureau did not request detention from Mother and did not recommend foster care for the children. The court found the Bureau had made a prima facie section 300 showing and ordered the children detained from Father—which had the effect of requiring him to live outside the family home—but permitted them to remain in Mother's custody. Father was ordered to have no contact with J.M., Y.S. or I.S. until disposition.[4]

A contested jurisdiction hearing took place on February 26, 2014. At that hearing, the only witness was the social worker who prepared the Detention/Jurisdiction Report. When asked whether J.M.'s story about the finger-bending incident was corroborated, the social worker said the doctor who examined J.M's injured finger had offered the opinion that the injury was consistent with the finger having been bent backwards. Finding J.M.'s injuries were serious (his finger was "badly sprained" and "extremely swollen and bruised"), the court sustained the allegation that Y.S. and I.S. were "at risk based on father's having physically abused the step sibling."

Having found the Bureau's core factual allegations to be true, the judge declared Y.S. and I.S. to be dependents within the meaning of section 300, subdivision (j). Pending disposition, the court continued the children's detention from Father, but

---

[4] There was some initial confusion about whether the court's no contact order on January 28 allowed Father to have visitation with Y.S. and I.S., but the issue was clarified at a jurisdictional pretrial conference on February 6, 2014 and as of that point Father was barred from contact with any of the three children pending disposition.

permitted weekly supervised visits at the Bureau with Y.S. and I.S.,[5] while leaving in place the bar on any contact with J.M. At this point in the proceedings, Mother was within weeks of giving birth to D.S. The court withheld comment on whether Father should be permitted to attend the birth and left that issue for the parties to work out. A few weeks later, in mid-April, 2014, Mother gave birth to the couple's third child, D.S.

Father requested at a hearing on April 30, 2014 that he be allowed to return to the family home when Mother was present to help with the baby and to bond with her. The Court denied his request, explaining "I'm not going to do that. I have... real concerns about [Father] and his ability to be around children in a safe manner. The way in which this physical abuse was inflicted, number one, I don't believe that you can reasonably conclude that this is limited to a child that's not his biological child. [Father was] living in the home and serving in many respects as a parental figure for the child. And the way it was done in secret with coercion to the child to maintain the secrecy of it, I have concerns that [he] poses a significant risk to any child that is in his presence...."[6]

Father's counsel argued that circumstances had changed and pointed out that Father had recently enrolled in an anger management class and a parenting skills class and was on a waiting list for an individual counseling program. The court was unmoved, commenting that "[u]ntil he comes forward and...is able to demonstrate that he gets what

---

[5] At a hearing a few weeks later, on March 19, 2014, the court granted Father's request to allow at least three weekly telephone calls to Y.S. and I.S., monitored by Mother, in addition to the supervised visits.

[6] A few weeks after her birth, the Bureau filed a section 300 petition with respect to D.S. In line with the detention orders pertaining to Y.S. and I.S., the Bureau recommended that "the Court detain [D.S.] from [Father] but allow the child to remain in the custody of the mother." Based on a determination that a prima facie case had been made, the juvenile court held a detention hearing on May 19, 2014 and found "that continuance of [D.S.]...in the home of the father is contrary to the welfare of the child in light of the Court having already sustained and found proven true that father has physically abused a half sibling of this particular child and that that abuse occurred in a manner that was premeditated and not done out of spur of the moment anger, which causes the Court grave concern for the safety of any child in the presence of the father." Accordingly, the Court adopted the Bureau's recommendation and detained D.S. on the same basis as it had previously done for Y.S. and I.S.

6

he did, that he takes responsibility for it and he understands...that that is completely inappropriate behavior—I don't really see the fact that he's on [a] waiting list to engage in counseling or that he's attended however many parenting classes he's attended that he's addressed the issues. The issue is whether or not he understands that what he did was significant and severe child abuse."

2.    *Disposition*

A contested disposition hearing as to J.M., Y.S. and I.S. took place on June 9, 2014. According to the Bureau's Disposition Report, dated May 19, 2014, there was a mutual desire among Father, J.M. and Y.S. for Father to return to the family home. J.M. and Y.S. both told the social worker they wanted Father to move back in with them. Father told the social worker he wanted to return as well. He presented certificates of enrollment in an anger management program, psychotherapy and parenting classes in an effort to demonstrate that he was ready to do so. Father also testified at the disposition hearing about his participation in anger management and therapy.

Father's attitude about the abuse of J.M., however, had not changed. He asserted his Fifth Amendment privilege when asked at the disposition hearing whether he was responsible for J.M.'s injured finger, but had reported to the social worker prior to the hearing he was not responsible for injuring J.M.'s finger. He stuck to his story that J.M. hurt himself as a result of a fall in his room, with the added the explanation that J.M.'s finger appeared to be dislocated and crooked after J.M.'s fall, so he pulled on it to try to relocate it. Father had no explanation for why J.M. would have blamed him for the injured finger, except perhaps that Father had taken away J.M.'s Playstation Plus game system earlier in the week, presumably as a consequence for the raisin-throwing incident.

The evidence at the disposition hearing showed that J.M. suffered other suspicious injuries, in addition to the black eyes and broken nose that had been reported previously in the Detention/Jurisdiction Report. According to the Disposition Report, J.M. had been taken to a hospital emergency room on December 14, 2013 with an injury to his left index finger. J.M. reportedly told emergency room personnel that his finger had been

7

injured in a fall from his bicycle. His finger was not fractured on this previous occasion, but he was diagnosed with a "dislocation, sprain [or] contusion" of his finger.[7]

At the conclusion of the disposition hearing, the court adopted the Bureau's recommendation and ordered J.M., Y.S. and I.S. removed from Father's physical custody while permitting them to remain in their mother's care. The effect of the court's disposition was to continue the arrangement that had been in place since the detention hearing, with Father barred from the family home, but with permission for Father to have controlled visitation privileges and telephone contact with Y.S. and I.S.[8] While announcing its findings, the court explained it saw the case as "troubling on...many levels." This was not a case, the court said, in which "the only evidence that...the abuse

_____

[7] There was, in addition, a colloquy with the court at the disposition hearing during which counsel for Y.S. and I.S. mentioned a batch of unidentified medical records that the Bureau apparently produced in discovery shortly before the disposition hearing. Counsel for Y.S. and I.S. made an offer of proof that these records would show the following—(1) Father had taken Y.S., then three years old, to the doctor on January 9, 2013, because she had fallen on her finger and bent it backward to where it looked dislocated. Father reportedly had popped the finger back into place. And (2) when Y.S. was seven months old she had suffered a contusion to the head, face and neck because she had fallen from a bed onto a wooden floor . Father objected to the court's consideration of the medical records concerning Y.S. and to the information in the Disposition Report about J.M's 2013 visit to the hospital emergency room, but the objection was overruled. The court explained, "[We] have Ms. Sanner [the social worker] here and these come directly off Ms. Sanner's case notes. This is a disposition. Hearsay is admissible. And certainly a social worker's notes of what a medical practitioner or school official reported to her is permissible in these proceedings." As to the summary of J.M's 2013 hospital visit, the ruling was correct. (Cal. Rule of Court 5.690(b).) The facts reported by Y.S.'s counsel concerning Y.S.'s 2013 doctor visit and other past injuries to her, however, are not in the Disposition Report, and the medical records to which she referred were never marked for identification or admitted into evidence. Since there is no indication of any stipulation to the offer of proof that counsel made, the facts she reported appear to be without evidentiary foundation in the record. Counsel's representations about past injuries to Y.S. may be true, but they involve extra-record matters and thus we will not consider them.

[8] Contra Costa County Superior Court records in Case No. MSD14-04865, of which we take judicial notice (Evid. Code, §§ 452, subd. (d), 459), show that Mother filed for a domestic violence restraining order against Father on October 31, 2014. It was dropped by the court on December 16, 2014.

took place [came from] the child—quite frankly, there's no reason for this child to have lied. If anything, he was terrified for reporting what occurred to him. But you have medical evidence which corroborated his reports. You have school officials who note...how inappropriate [Father] has been in school. In fact, [they are] afraid for [J.M.]."

Unwittingly confirming his problem with self-control, Father's reaction upon hearing the court's description of his conduct and its impact on his children was an open show of disrespect in the courtroom. "[Y]ou shake your head and smirk at me," the court stated, directing its comments at Father, "[b]ut...that's exactly what's reported here." "And we're no further along on [your] understanding what [you] did and how inappropriate it was today than we were when this case first presented itself." Repeating concerns that it had expressed in earlier proceedings concerning D.S. (see fn. 6, *ante*), the court stated "grave concerns" that despite J.M.'s statements to numerous professionals regarding how he was injured and the corroborating evidence, Father continued to deny it had occurred. Calling Father's behavior "troubling, abusive, [and] sneaky," the court once again expressed the view that it did not believe "any child" would be safe in Father's care.[9]

Father filed a timely notice of appeal from the dispositional orders with respect to Y.S. and I.S., challenging the jurisdictional findings as well. (*Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1754 (*Blanca P.*).) The dispositional orders and jurisdictional findings as to J.M. and D.S. are not challenged in this appeal.

## II. DISCUSSION

### A. Substantial Evidence Supports the Jurisdictional Findings

Father contends there was insufficient evidence to support the juvenile court's jurisdictional findings for Y.S. and I.S. In the trial court, the Bureau bore the burden of proving its case at that stage by a preponderance of the evidence. (§ 355, subd. (a).) The

---

[9] The court held a jurisdictional hearing for D.S. and declared her to be a dependent on June 9, 2014, immediately following the disposition hearing for Y.S. and I.S. at which the above findings were made. The record here does not reflect the ultimate disposition as to D.S.

substantial evidence standard of review applies on appeal.  (*In re Christopher C.* (2010) 182 Cal.App.4th 73, 84.)

Section 300, subdivision (j), subjects a child to the jurisdiction of the juvenile court if he or she meets following statutory criteria: "The child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions.  The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian and any other factors the court considers probative in determining whether there is a substantial risk to the child."

1.  *In re Rocco M.* and *In re Steve W.*

Father does not seriously argue that the evidence was insufficient to show his abuse of J.M.  Rather, he concentrates on whether the evidence of J.M.'s abuse alone was enough to show that Y.S. and I.S. were also at risk.  In urging this point he first relies on two cases for the proposition that a single instance of past abuse will not support a finding of future risk:  *In re Rocco M.* (1991) 1 Cal.App.4th 814, 824 (*Rocco M.*) and *In re Steve W.* (1990) 217 Cal.App.3d 10, 22 (*Steve W.*).

*Rocco M.*, *supra*, 1 Cal.App.4th 814 does not aid Father's cause.  That case involved a boy who had been neglected as a young child and placed in foster care between the ages of five and nine.  (*Id.* at p. 817.)  His mother had severe substance abuse problems and, as a result, Rocco was frequently in an environment where he saw and was in close proximity to his mother's consumption of drugs and alcohol.  (*Ibid.*)  The Court of Appeal upheld the jurisdictional finding in *Rocco M.*, finding "ample evidence of neglect" (*id.* at p. 820) because the mother had "created [a] danger that Rocco would ingest hazardous drugs" (*id.* at p. 825).

Although the holding in *Rocco M.* cuts against him, Father relies on the Court of Appeal's observation in dicta there that "past infliction of physical harm by a caretaker, standing alone, does not establish a substantial risk of physical harm; '[t]here must be some reason to believe the acts may continue in the future.' " (*Rocco M.*, *supra*, 1

Cal.App.4th at p. 824.)  This statement had to do with an isolated instance of abuse inflicted by a caretaker, a friend of the mother, who had kicked Rocco in the stomach when the boy was in his care on one occasion.  It did not refer to abuse by a parent or stepparent, and there was nothing to suggest any kind of pattern of similar physical abuse.  In fact, *Rocco M.* expressly distinguished cases involving abuse by a parent on grounds that they presented "an *identified, specific hazard* in the child's environment."  (*Ibid.*)  On this record, Y.S. and I.S. did have an "identified, specific hazard" in their environment, and it came from Father.  Their vulnerability to him cannot be fairly compared to a neglect case or abuse involving a one-time baby-sitter.

*Steve W.*, *supra*, 217 Cal.App.3d 10, 12 involved the removal of a baby from his mother's care because the baby's father had killed his five-year-old half-brother.  The mother was not present when the older boy was fatally injured; Steve's father gave false explanations for the boy's injuries; and the mother broke off relations with Steve's father after the older boy's death.  She assisted in his prosecution, was self-supporting through full-time employment, and had suitable living arrangements for herself and the baby.  (*Id.* at pp. 14, 16.)  Steve's mother conceded the jurisdictional finding was warranted, but she appealed the disposition.  (*Id.* at p. 16.)  Steve's father was serving a six-year prison term, and therefore was unlikely to have access to the baby.  (*Id.* at p. 22 & fn. 2.)  Importantly, Steve himself also appealed the dispositional order, favoring placement with his mother.  (*Id.* at pp. 15-16.)  In these circumstances, the Court of Appeal found insufficient evidence to remove Steve from his mother.  (*Id.* at p. 23.)  The specific holding of *Steve W.* highlights an important distinction setting that case apart from this one.  There, it was the nonoffending parent from whom Steve had been removed and who was appealing the removal order, whereas here only the abusing parent has had custody suspended; the nonoffending parent (Mother) has been allowed to retain custody.  Thus, Father is not similarly situated to the appellant in *Steve W.*

2.  *Blanca P.*

Throughout his briefs, Father complains repeatedly that the juvenile court was improperly "fixated" on his refusal to acknowledge and admit abusing J.M., an error he

claims "permeated the proceedings." He cites *Blanca P.*, *supra*, 45 Cal.App.4th at page 1741, for the proposition that "a parent's refusal to confess to the allegations of the petition are not substantial evidence of a risk of detriment to the minors."

We do not find *Blanca P.* to be of much relevance here. The narrow legal issue "at the very heart" of *Blanca P.*, *supra*, 45 Cal.App.4th at page 1754, centered on a finding of sexual molestation by a father of his three-year-old daughter. The issue was whether that finding, made at a jurisdictional hearing early in the case, had binding effect later, post-disposition, at the 18-month review stage. (*Ibid.*) The record showed that the trial judge who made the finding did not understand the procedural setting in which he was operating (he mistakenly said he was ruling at a six-month review) and did not appreciate that the truth of the molestation charge needed to be scrutinized carefully (he had not read the subsequent petition in which the allegation was made and mistakenly said that because the case was at six-month review the allegation had already been established as true and could no longer be questioned). (*Id.* at pp. 1743–1745.) After acknowledging this confusion and withdrawing his incorrect statements just before taking the matter under submission, the judge proceeded to make a molestation finding anyway, relying on nothing more than a social worker's interview of the three-year-old in which the child at first denied her father had touched her genitals but eventually said he did in response to suggestive questioning. (*Id.* at pp. 1742, 1744–1745.)

*Blanca P.* arrived in the appellate court not on appeal, but on writ review of a second trial judge's finding at an 18-month review hearing that it would be detrimental to permit family reunification at that stage, despite months in which the father had participated diligently and cooperatively in services. The second judge's order was unexplained, but appeared to be based on concerns about the earlier molestation finding. (*Blanca P.*, *supra*, 45 Cal.App.4th at pp. 1742, 1747.) Describing a phenomenon it called the "confession dilemma" in dependency cases (*id.* at pp. 1752–1754) , where a parent faced with unfounded molestation allegations must decide whether to falsely confess, lest "denial itself....end up preventing reunification" (*id.* at p. 1752), the Court of Appeal refused to give the prior molestation finding collateral estoppel effect in light of later

12

developed evidence, a psychologist's expert opinion, casting serious doubt on whether the molestation ever happened (*id.* at pp. 1745–1747). The writ was granted, and a new 18-month review hearing was ordered at which the underlying molestation charge could be fully litigated. (*Id.* at pp. 1759–1760.) As pertinent here, that was the issue decided and the relief granted in *Blanca P.* Its holding has no applicability in this case.

A prominent theme in *Blanca P.*, to be sure, was the heightened need for careful fact-finding when sexual molestation charges surface in dependency cases. The Court of Appeal was troubled by the haphazard way in which the molestation charge there had been handled in the trial court, with a key finding made under rushed and confused circumstances and then passed along from one judge to another, and no one bothering to examine closely whether the evidence actually supported the charge in the first place. The court explained, "[t]he hearing on a contested petition alleging child sexual abuse is...extraordinarily important. It is not the sort of thing to be rushed, or taken routinely. Allegations of child molestation are *serious;* they merit more than a rubber stamp. With the exception of death penalty cases, it is hard to imagine an area of the law where there is a greater need for reliable findings by the trier of fact." (*Blanca P.*, *supra*, 45 Cal.App.4th at p. 1754.)

All of this is no doubt just as true today as it was when *Blanca P.* was decided in 1996,[10] but what happened in that case bears no resemblance to the case before us. Obviously, there is no issue of sexual molestation here. And on this record, unlike in *Blanca P.,* we have a corroborated finding of abuse; that finding is fully supported by the record; there was evidence the abuse is part of a pattern; there is no independent evidence supporting Father's denial of responsibility; and there is much to lend specific credence to J.M.'s version of how the abuse took place, including Father's manipulative efforts to

---

[10] "[W]e. . .know that jurisdictional findings are made under extreme time pressures, and with a certain degree of urgency necessary to protect children. The hard truth is that all too often. . .juvenile courts and counsel do not have enough time to fully explore molestation issues in jurisdictional hearings, and psychological evidence about a parent's propensity to commit molestation is likely to be unavailable, inadmissible or nonexistent." (*Blanca P.*, *supra,* 45 Cal.App.4th at pp. 1758-1759.)

cover it up. It is also quite clear that the court here did not rely on Father's persistent denials of responsibility as a substitute for evidence that the abuse in fact occurred, but rather as a consideration to be taken into account in fashioning appropriate relief. The court's handling of Father's denials of responsibility was not the product of some sort of moral belief that confession is a prerequisite to redemption. Rather, we read the court's comments on the issue as nothing more than a commonplace observation that a problem cannot be fixed until it has been acknowledged.

In re Jessica B. (1989) 207 Cal.App.3d 504, cited in Blanca P., is instructive here. In that case, a father brought his infant daughter to the hospital with a skull fracture and gave an unconvincing story about how the injury had occurred. (Id. at p. 508.) The fact that he subsequently entered therapy was not enough to convince the Court of Appeal he did not present a danger to his child. The appellate court explained that traditional treatment such as therapy "is of limited value until the abuse is admitted." (Id. at p. 516.) The juvenile court in this case properly invoked the same logic in rejecting Father's attempt to show his readiness to resume parenting simply because he had recently begun participating in counseling of various kinds. Father urged the court to find that circumstances were different because of his commitment to these counseling programs— and perhaps if he continues with them, at some point he will be in a position to show he is a changed man—but at disposition the court was amply justified in rejecting his claims as insincere, especially since he refused to acknowledge the seriousness of his acts.

3. *Consideration of the Totality of the Circumstances*

Finally, Father contends the juvenile court placed too much weight on a single instance of abuse and failed to consider the "totality of the circumstances." (Cf. *In re I.J.* (2013) 56 Cal.4th 766, 773.) We disagree. It is Father who fails to take into account the totality of the circumstances here. First of all, one of the factors a court may properly consider, listed expressly on the face of the statute, is the age of the child involved. (§ 300, subd. (j).) J.M., who was nine when the Bureau intervened, reluctantly managed to speak up about the abuse that he suffered, but whether five-year-old Y.S. and nineteen-

14

month-old I.S. were capable of doing so was legitimately a matter of concern. That consideration is basic to the situation here, and it was taken into account.

Second, there was clear evidence that Father has anger management problems. The court's repeatedly expressed concerns about Father's temper were fully justified by the evidence. School personnel expressed concern about Father's volatility; he "los[t] his cool" with the social worker ; and then he confirmed the many reports about his volatile nature by openly displaying his displeasure when the judge announced her findings in the courtroom.

Third, there was more evidence of past abuse than the single incident that led to the Bureau's involvement. J.M. described to the authorities past spankings with a belt, a shoe, and a clothes hanger. He described being slapped across the face and having a piece of pizza smeared in his face. He showed up at school with two suspicious black eyes a week after a minor head injury at school, and there was evidence of an unexplained past nose fracture. And he had been taken to the hospital for a similar finger injury little more than a month prior to present injury that triggered the initial report to the Bureau. There is a clear pattern here. Given the overall circumstances—two very young children, in the hands of a caretaker with a volatile temper—we have little difficulty concluding, as did the juvenile court, that Y.S. and I.S. were in an environment where there was "an adult with a proven record of abusiveness" (*Rocco M.*, *supra*, 1 Cal.App.4th at p. 824).

## B. Substantial Evidence Supports the Dispositional Orders

A dependent child may not be taken from the physical custody of his or her parent unless the juvenile court finds by clear and convincing evidence that there is a "substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected" without removal. (§ 361, subd. (c)(1).) We review the court's disposition order for substantial evidence (*In re T.V.* (2013) 217 Cal.App.4th 126, 135-136; *In re Jason L.* (1990) 222 Cal.App.3d 1206, 1214), bearing in mind the juvenile court's heightened requirement of clear and convincing

15

evidence (*In re Ashly F.* (2014) 225 Cal.App.4th 803, 811), and considering the facts as they stood at the time of the disposition hearing (*In re Isayah C.* (2004) 118 Cal.App.4th 684, 701).

Father again claims the evidence was insufficient to meet the statutory standard, resting his argument largely on *In re Hailey T.* (2012) 212 Cal.App.4th 139 (*Hailey T.*). There, the court of appeal reversed a trial court's order removing a three-year-old girl from parental custody. (*Id.* at pp. 145. 149.) The parents in that case had taken the girl's four-month-old brother to the hospital with petechiae (hemorrhage in the eye), which an emergency room doctor concluded had been inflicted nonaccidentally. (*Id.* at p. 142.) Neither parent could explain how the injury occurred, but they suggested three-year-old Hailey may have injured her little brother. (*Ibid.*) An expert testified it was unlikely that Hailey could have inflicted the injury, and it appeared likely the injury was caused by the baby being struck in the face or struck and strangled. (*Id.* at p. 144.)

The juvenile court sustained a petition under section 300, subdivisions (b) and (j), and both children were removed from the home. (*Hailey T.*, *supra*, 212 Cal.App.4th at pp. 143, 145.) There was no evidence Hailey herself had been abused. (*Id.* at p. 147.) She was verbal and able to articulate any abuse, and she attended school where there were mandated reporters, which was seen as providing some degree of monitoring. (*Ibid.*) There was also no evidence the parents had abused the infant son, except for the petechiae and the expert's suspicions as to its cause. (*Id.* at p. 148.) While the infant was to be left in an out-of-home placement (*id.* at p. 141, fn. 2), Hailey could be protected through less drastic means, such as return to the parents with unannounced visits and services through a public health nurse. (*Id.* at p. 148.)

The physical abuse Father inflicted in this case was not an isolated instance, explained by momentary loss of control or unlikely to be repeated. The act of bending a child's finger backwards to the point where it became sprained, bruised and badly swollen was an intentional act of cruelty, and Father's awareness of his wrongdoing was demonstrated by his threat to J.M. about disclosing the truth. In addition to the finger injury, as catalogued above, J.M. had suffered numerous suspicious injuries which could

16

lead a reasonable trier of fact to conclude Father had been guilty of a pattern of excessive corporal discipline. Thus, there was good reason to fear for all of the younger children's safety. Unlike Hailey, who had access to mandated reporters and was old enough to articulate to others any abuse she may have suffered, Y.S. and I.S. are each in a particularly vulnerable position. There is no indication in the record that Y.S. had regular contact with mandated reporters, as was the case with Hailey. And obviously I.S. is still too young (19 months at disposition) to be expected to report any abuse he might experience. Finding *Hailey T.* to be inapposite, we conclude that the court's dispositional order as to each child is supported by substantial evidence.

**C. ICWA Notice Was Not Required Because the Bureau Did Not Seek to Place the Children in Foster Care.**

*1. ICWA inquiry and notice requirements*

Title 25 of the United States Code section 1912 provides: "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention." An "Indian child" is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); see § 224.1, subd. (a).)

"The purpose of the ICWA is, of course, to 'protect the best interests of Indian children and to promote the stability and security of Indian tribes and families.' (25 U.S.C. § 1902; see *In re Karla C.* (2003) 113 Cal.App.4th 166, 173-174.) 'The ICWA presumes it is in the best interests of the child to retain tribal ties and cultural heritage and in the interest of the tribe to preserve its future generations, a most important resource. [Citation.]' ([*In re*] *Desiree F.* [(2000)] 83 Cal.App.4th [460,] 469.)." (*Guardianship of D.W.* (2013) 221 Cal.App.4th 242, 249.) The ICWA itself does not expressly impose any duty to inquire as to Indian ancestry. Neither do the controlling federal regulations. (See

17

25 C.F.R. § 23.11(a) (2014).) ICWA, however, does provide that states may establish "a higher standard of protection to the rights of the parent . . . of an Indian child than the rights provided under [ICWA]." (25 U.S.C.A. § 1921.)

Consistent with that provision, California law imposes on county welfare departments and the juvenile court "an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300, 601, or 602 is to be, or has been, filed is or may be an Indian child in all dependency proceedings and in any juvenile wardship proceedings if the child is at risk of entering foster care or is in foster care." (§ 224.3, subd. (a).) A California court must order the parents to fill out a Parental Notification of Indian Status form (ICWA-020) at the first appearance by the parent in a section 300 proceeding. (§ 224.3, subd. (a); Cal. Rules of Court, rules 5.480, 5.481(a)(2).) To the extent the California statutes provide greater protection for the parents or the tribe of an Indian child, the California provisions control. (§ 224, subd. (d).)

Under section 224.2, subdivision (a), "If the court, a social worker, or probation officer knows or has reason to know that an Indian child is involved, any notice sent in an Indian child custody proceeding under this code shall be sent to the minor's parents or legal guardian, Indian custodian, if any, and the minor's tribe . . . ." An " 'Indian child custody proceeding' means a 'child custody proceeding' within the meaning of Section 1903 of the Indian Child Welfare Act, including a proceeding for temporary or long-term foster care or guardianship placement, termination of parental rights, preadoptive placement after termination of parental rights, or adoptive placement."[11] (§ 224.1, subd.

_____

[11] ICWA itself defines "child custody proceedings" as follows: "For the purposes of this Act [25 USCS §§ 1901 et seq.], except as may be specifically provided otherwise, the term—[¶] (1) 'child custody proceeding' shall mean and include—[¶] (i) 'foster care placement' which shall mean any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated; [¶] (ii) 'termination of parental rights' which shall mean any action resulting in the termination of the parent-child relationship; [¶] (iii) 'preadoptive placement' which shall mean the temporary placement of an Indian child in a foster home or institution after the

18

(d).)  Hence, tribal notice is required only if the proceeding qualifies as an "Indian child custody proceeding," (§ 224.1) which in turn depends upon whether the party filing the "involuntary proceeding" "seek[s]. . .foster care" (25 U.S.C. 1912 (a)) or one of the other out-of-home placements identified in the statute.

2.     *Conflicting evidence of remote Indian ancestry*

In this case, both parents were ordered to fill out a form ICWA-020 at the detention hearing on January 28, 2014.  Even before the first court appearance, on the day J.M. first came to the Bureau's attention, the social worker inquired about Indian ancestry, and Mother said she had none.  Mother reportedly filled out a form ICWA-020 making this same representation under oath.  Yet, on January 28, at the detention hearing, she told the court that her great grandfather was an Apache.  The court made no findings relating to whether the children were Indian children subject to ICWA., but did tell Mother to give the social worker any information she had about her Native American history before the next hearing.

The Bureau's report prepared for the disposition hearing indicated yet again that Mother had filled out a form on February 25, 2014, saying she did not have Native American ancestry.  Neither of the ICWA forms signed by Mother appears in the record.  Father signed forms on two occasions stating he had no Indian ancestry.  Against this backdrop of conflicting information, Father claims the court erred in failing to ensure that the Bureau sent notices to the Apache tribes in accordance with ICWA.  (Cf. *In re Gabriel G.* (2012) 206 Cal.App.4th 1160, 1167-1168 [where department had conflicting information that infant may have had Native American paternal grandfather, court's failure to inquire further was a violation of § 224.3].)

Because the alleged Indian relationship was so distant, there was no statutory duty imposed upon the court or the Bureau to send notice to the children's potential Indian

termination of parental rights, but prior to or in lieu of adoptive placement; and [¶] (iv) 'adoptive placement' which shall mean the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption." (25 U.S.C. § 1903(1).)

tribe. (§ 224.3, subd. (b)(1) [duty of sending notice attaches when a family member "provides information suggesting... one or more of the child's biological parents, grandparents, or great-grandparents are or were a member of a tribe"]. ) According to the information provided to the court, the children here had at most a great-great-grandfather who was an Apache. The implication of the statute is that notice was not required because the children were four generations removed from their only alleged Indian ancestor. But we need not rest our decision solely on whether the court "knew or had reason to know" the children were Indian children within the meaning of ICWA, for there is another reason why the failure to send notice to the Apache tribes was not a violation of ICWA.

3. *ICWA notice was not required where the Bureau did not recommend foster care*

The Bureau argues that no notice was required in the present case because the children were placed with their mother and not in foster care. We conclude it is not the actual placement of the child that governs the question of notice; whenever a party is "seeking . . . foster care placement" of an Indian child through an involuntary proceeding, that party must give notice to the tribe.[12] (25 U.S.C. § 1912.) We agree with the Bureau, however, that notice was not required in this case because it never sought foster care placement, but rather recommended from the outset that Mother retain custody of the three children. In fact, the petition had a box to check stating, "It is probable the child will be entering foster care," and that box was not checked.

Father cites *In re Jennifer A.* (2002) 103 Cal.App.4th 692 (*Jennifer A.*), a section 300 proceeding, for the proposition that notice under ICWA must be given if the child is to be removed from the custody of even one parent because the child cannot be returned to that parent "upon demand." (25 U.S.C. § 1903(1)(i).) But in *Jennifer A.*, the child was detained from her mother's home due to neglect and her mother's methamphetamine use.

---

[12] "Foster care placement" is defined as "any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand." (25 U.S.C. § 1903(1)(i).) It does not include placement with one of the parents. (*In re J.B.* (2009) 178 Cal.App.4th 751, 758 (*J.B.*).)

(103 Cal.App.4th at pp. 697-698.) At the detention hearing, both parents claimed Native American ancestry. (*Id.* at p. 698.) Though ultimately placed with her father, who had been a noncustodial parent, Jennifer was initially placed in a temporary emergency shelter and later in foster care for approximately six weeks between detention and disposition. (*Ibid.*) In its report filed for the disposition hearing, the child welfare agency recommended that she remain in foster care because she did not want to live with her father. (*Ibid.*) Because the ultimate outcome was unknown at the outset of the hearing—and foster care remained a distinct possibility—the appellate court held ICWA notice should have been given. (*Id.* at pp. 700-701.) *Jennifer A.* is distinguishable in that Y.S. and I.S. were never placed in foster care and the Bureau never sought to have them placed in foster care.

Notice to Indian tribes is not required in every situation where it comes to light in a juvenile dependency case that a dependent child may have some degree of Native American heritage. "By its own terms, [ICWA] requires notice only when child welfare authorities seek permanent foster care or termination of parental rights; it does not require notice *anytime* a child of possible or actual Native American descent is involved in a dependency proceeding."[13] (*In re Alexis H.* (2005) 132 Cal.App.4th 11, 14 (*Alexis H.*).) The court of appeal in *Alexis H.*, another section 300 case, proceeded cautiously: "Because the Department sought neither foster care nor adoption, the [ICWA] *seemingly* does not apply." (*Id.* at p. 15, italics added.) Its actual holding, however, was that any error in the notices was harmless. (*Id.* at p. 16.) The case is also distinguishable from the one before us because the welfare agency in *Alexis H.* did send notices to the Indian tribes; thus, the issue was defective notice, not complete lack of notice. (*Id.* at p. 14.)

More recently, *J.B.*, *supra*, 178 Cal.App.4th 751, again in a dependency context, held that "ICWA does not apply to a proceeding to place an Indian child with a *parent*" (*id.* at p. 758); rather, "the legislative intent behind ICWA expressly focuses on the

---

[13] We question this statement insofar as it refers to "permanent" foster care. ICWA itself defines "foster care placement" as including temporary foster care. (25 U.S.C. § 1903(1)(i).)

removal of Indian children from their *homes and parents*, and placement in *foster or adoptive* homes" (*id.* at p. 759). In *J.B.* the child was unquestionably an Indian child. (*Id.* at p. 755.) The issue on appeal was whether the court was required to make special findings under section 361, subdivision (c)(6), which turned on whether the hearing in which the child was removed from the mother and placed with the noncustodial father was "an Indian child custody proceeding" within the meaning of section 361, subdivision (c)(6).[14] In an "Indian child custody proceeding" the court must find by clear and convincing evidence that "continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child . . . ." (*J.B.*, *supra*, at p. 755.) Furthermore, "that finding [must be] supported by testimony of a 'qualified expert witness' as described in Section 224.6." (*Ibid*.) In the end, *J.B.* held supplemental findings under section 361, subdivision (c)(6) were not required when custody of an Indian child was transferred from one parent to the other. (*Id.* at p. 758.) We think it is key to the decision that the child welfare agency was apparently not seeking foster care placement for J.B.

We discern a common thread running through the interpretation and application of the ICWA in *Jennifer A* , *Alexis H.* and *J.B.*—all of these cases place importance on whether foster care was being sought, an issue which we too think is key based on the plain terms of the statute—and thus we now hold that the ICWA tribal notice requirement only applies, assuming all other statutory requisites are met, when the child welfare agency *seeks* foster care placement of an Indian child, even if the judge ultimately orders the child placed with the child's parent or current custodian. Where, as here, the agency never seeks foster care placement, the ICWA does not require tribal notice.

---

[14] An "Indian child custody proceeding" is "a 'child custody proceeding' within the meaning of Section 1903 of the Indian Child Welfare Act, including a proceeding for temporary or long-term foster care or guardianship placement, termination of parental rights, preadoptive placement after termination of parental rights, or adoptive placement." (§ 224.1, subd. (d).)

## III. DISPOSITION

The orders adjudicating Y.S. and I.S. as dependent children and ordering them removed from their father's custody are affirmed.

                                                   _____

                                                   Streeter, J.

We concur:

_____

Ruvolo, P.J.

_____

Reardon, J.